STEWART L. ORDEN
Attorney at Law
2 Overhill Road Suite 400
Scarsdale, New York 10583
Tel. (914) 393-9450
Fax. (914) 472-1111
stewartorden@stewartorden.com
www.stewartorden.com

May 30, 2019

Honorable Analisa Torres
United States District Court
500 Pearl Street
New York, New York 10007

Re:    United States v. James Robinson
       17 CR 611 (AT)

Dear Judge Torres,

This letter is submitted on behalf of Mr. Robinson who is scheduled to be sentenced on

July 24, 2019.

On October 4, 2017, Mr. Robinson was charged in a ten-count indictment with being a

member of a violent criminal enterprise; the MBG, also known as the Money Bitches Guns gang,

or Mill Brook Gangstas, whose members used violence, including murder, to further support

their narcotics business. Mr. Robinson has never before been accused of committing an act of

violence. Specifically, Mr. Robinson was charged in Count I with Racketeering Conspiracy in

violation of 21 USC§1962; in Count III with Conspiracy to Distribute Narcotics in violation of

21 USC§841(b) (1) (a); and in Count VII with knowing use and possession of firearms which

were brandished and discharged in violation of 18 USC§924(c). On July 25, 2018 Mr. Robinson

1

entered a plea of guilty to a lessor-included offense within Count III of the indictment pursuant to a plea agreement with a mandatory five-year minimum sentence. The parties stipulated to a Guidelines sentencing range of 63-78 months. The probation department agrees with that Guidelines range and recommends a sentence of sixty-three months, the minimum in the stipulated Guidelines range. For the reasons set forth below, we urge this Court to impose a sentence of sixty-months, slightly below the recommended sentence.

### *Mr. Robinson's History and Personal Characteristics*

Mr. Robinson and 13 other co-defendants were involved in gang activity in the Millbrook Houses in the South Bronx, New York. Members of two different gangs, MBG and YGz, were involved in violence and related activities designed to protect fellow gang members and the distribution of narcotics.

This is Mr. Robinson's first conviction for a crime of such a serious nature. His two prior convictions, one a misdemeanor. This will be the first time he will face a term of lengthy incarceration.

Mr. Robinson, age 31, was born the son of a seventeen-year-old mother, and a father whose name he does not even know. His mother was a crack addict who was unable to care for her children; he was raised by his grandmother. At 16 nearly 17 years of age, his grandmother died, and as a result, he and his younger brother were left alone to fend for themselves. As a result of this abandonment, Mr. Robinson quit school in eleventh grade. Thereafter, he became involved in gang-activity to make-up for what was lacking in his home life and to support himself, and his brother for whom he was the sole provider. Ultimately, he found a loving partner, Antoneya Stone, and together they are now parents to an infant daughter. Ms. Stone and others have provided compelling statements regarding the character of Mr. Robinson. The

statements indicate that: he is a quiet, devoted family man and father; prioritizes his home life as a partner, father, and uncle; values education and constructive after-school activities for his nieces; sought out full-time gainful employment immediately upon learning that he was going to be a father, and was so dedicated to his job that he was promoted to a supervisory position.

> "James was always quiet to himself he's always been a family man and a lot of people looked up to him because he stayed to his self and stayed out of trouble for the most part. James had a few jobs since he's been in a relationship with me he used to make sure I furthered my education and still to this day pushes me to keep on going I honestly don't think I would have finished if it wasn't for him and a few others."
> Antoneya Stone (EX A)

> "My relationship to James Robinson is he is the father of my niece Jaila Robinson-Stone. I have known him more then ten years and he has always been to himself. He was working and became supervisor the day he was taken in. He spent most of his time with my sister and they went to appointments together, they also went on dates He barely was outside more of a home body. He is family oriented and loved spending time with the kids especially our nieces brought out his inner kid that usually be when you see him laugh and be goofy the most."
> April Stone (EX B)

> "I have known James for 7 years as a close family friend and the godmother of his 15 month old daughter. I know James as a quiet family man. Although he has been in trouble in the past, he has changed his mindset for a more positive life. Prior to his arrest he found out he was having a baby girl and began working a full time job and was just promoted to a supervisor position. He has gained the upmost respect from his employers and family. James also took on the roll of raising his niece along side his girlfriend. He had been a huge motivation in his nieces and nephews life, when it comes to school and making sure their extra curricular activities remain positive or at least educational."
> Monique Wyche (EX C)

The legal framework within which an appropriate sentence should be imposed is one of reasonableness, whether or not that sentence falls within the Guidelines range. In selecting a sentence, this Court should take as "its lodestar the parsimony clause of 18 U.S.C. § 3553(a) ...." *United States v. Douglas*, 713 F3d. 694, 700 (2d Cir. 2013), *citing United States v. Fernandez*,

443 F.3d 19, 27 (2d Cir. 2006). That provision directs sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the factors set out in 18 U.S.C. § 3553(a) (2)," *United States v. Douglas* at 700, *citing United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010), namely, "proportionality, deterrence, incapacitation, and rehabilitation." *Id.; see also*, *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). Pursuant to 18 U.S.C.A. §3553 and the all-important parsimony clause, District courts "shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection" (emphasis added). As such, it is a District's court's obligation to impose the lowest appropriate sentence when considering the need for the sentence imposed by reflecting on, in pertinent part, the seriousness of the offense, deterrence, protection of the public from further crimes by the defendant, and to provide the defendant with needed educational or vocational training in the most effective manner. 18 U.S.C.A. §3553. Further, the Court shall impose a sentence "of the kind, and within the range, referred to in subsection (a) (4) unless the court finds that there exists [a] … mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission …." 18 U.S.C.A. § 3553.

An application of these factors to the instant case demonstrates that a Guidelines sentence would result in a sentence greater than necessary to achieve the goals of sentencing due to mitigating factors unique to Mr. Robinson. A quantity-driven sentence would overstate the seriousness of the crime given Mr. Robinson's particularized involvement in the charged conspiracy.

Furthermore, and most importantly, perhaps to prevent the abandonment he was faced with as a young child, shortly before he was going to become a father, Mr. Robinson obtained full-time, legitimate employment. Mr. Robinson never knew his father; he was abandoned. His

mother, emotionally and physically abandoned him by virtue of her crack cocaine addiction. And then, at the young age of 16 he was once again abandoned by the death of his sole caregiver, his grandmother. While it was unfortunate, let alone criminal, for Mr. Robinson to engage in the conduct he did, clearly he has since come to learn, on his own and prior to his arrest, that in order to break the vicious cycle of abandonment, he had to do more, which has been demonstrated by immediately seeking out honorable work. While in most cases, individuals of such an upbringing repeat the cycle of abandonment, Mr. Robinson sought to break it. As evidenced in their letters to the court, Robinson's supportive family will assist with his re-entry and ensure law-abiding behavior. After completing his sentence, Mr. Robinson is committed to returning home, yet again seeking gainful employment, and fully engaging with his partner in raising their daughter. As stated above, the reasons for imposing a sentence are to punish, rehabilitate, promote respect for the law, deter future criminal conduct, protect the public from the defendant, and provide the defendant with necessary educational or vocational training and medical care. *See* 18 U.S.C. § 3553(a) (2).

In the instant case, before the defendant's arrest, he demonstrated a respect for the law on his own initiative by seeking full-time employment and apparently was very successful in this endeavor as he was promoted to a supervisory position shortly thereafter. Based on this conduct, there is no reason to believe that the defendant will return to criminal activity, since by all accounts he prioritizes family, and therefore, there is no reason to believe that the public needs to be protected from any additional crimes that Mr. Robinson might commit. While Mr. Robinson made bad choices after he was abandoned as a child, and had to care for his younger brother as well, he apparently and ultimately matured on his own. He did not abandon his girlfriend when he learned she was pregnant. Instead, he committed even more fully by seeking honorable work

to support both her and their unborn child. Having grown up in a traumatic environment, we argue that his actions (not his words) exemplify a significant turning point in Mr. Robinson's life to the betterment of not only the defendant, but his significant other, and young infant child. It is our position that this conduct should be recognized by this court as a mitigating circumstance warranting a variance. There are few individuals who experience the losses he has suffered at such a young age, with no parental or gown-up guidance, and then take it upon themselves to turn their life around. Mr. Robinson did just that before he was ever arrested in the instant case. Furthermore, as is indicated in the Probation report, Mr. Robinson is looking forward to continuing his education and earning his GED.

Because of his character, both demonstrated through his actions and as testified to by his loved ones, a Guidelines sentence would go beyond just punishment as it would interrupt his valiant efforts to rehabilitate himself in order to break the cycle of abandonment for his loved ones. The consequences of incarceration on his family, especially his infant daughter, who depend on him, have affected him tremendously. That is one of his primary expressed concerns regarding incarceration. In order to achieve the goal of providing Mr. Robinson with continued incentive to behave lawfully, we argue that he would be better served by imposing a non-Guidelines sentence that would allow him to return home a little sooner so as to assume his familial responsibilities.

### *The Nature and Circumstances of the Offense*

The offense is extremely serious mandating a serious punishment and we argue that a 60-month sentence is quite a serious punishment.

### *Punishment, Deterrence, and Protecting the Public*

Mr. Robinson committed serious crimes that merit serious punishment. But the many

mitigating facts in his case mean that extended incarceration would serve no useful purpose. With respect to the need for the sentence to punish, deter, and incapacitate, § 3553(a) (2) (A)– (C), a sentence outside the guidelines suffices for the reasons stated above and below.

### The Defendant, a Pre-Trial Detainee at MDC Brooklyn was unconstitutionally punished as a result of inhumane conditions during an extended outage at the institution

Mr. Robinson was incarcerated at the MDC Brooklyn during the well-known January, 2019 power outage. During this entire period of time, for approximately one and one-half weeks, all power was out. Mr Robinson had to endure freezing cold temperatures, cold showers, cold food, and was in the dark. Additionally, Mr. Robinson suffered from a painful toothache that was left untreated.

It has been established, particularly in this Circuit, that courts can grant sentencing relief in the form of downward departures and variances based upon unduly harsh treatment in custody, whether pretrial custody or the likelihood of having to endure such burdens during a prison sentence. The rationale behind the courts' granting of such relief, whether expressed or implied in published opinions, has been two-fold: the first is one of equitable compensation for excessive hardship by treating both suffering and time as components of punishment and reducing the time component of the defendant's sentence accordingly. The second is the need to deter those correctional authorities within the courts' jurisdiction from causing or tolerating the abhorrent conditions that produced such excessive punishment in the first place. In this case, we believe that particularly meaningful sentencing relief should be granted based upon a third rationale that relates to deterrence: the need for the Court to show institutional condemnation of the gross negligence and indifference by MDC officials that resulted in wholesale suffering by pretrial inmates under their care in this District, and similar condemnation of the misrepresentations and the cover-up by some of those officials that extended the length of the

inhumanity and prevented assistance from reaching the jail sooner.

In *United States v. Lara*, the Second Circuit affirmed the right of Judge Glasser to downwardly depart based upon the "added burdens of incarceration" due to the defendant's 'vulnerability' in prison arising from his 'immature appearance, sexual orientation and fragility'" 905 F.2d 599, 603 (2d Cir.1990). The Second Circuit held that such factors were not adequately considered by the Sentencing Guidelines and therefore were appropriate grounds for departure under 18 U.S.C. §3553(b). *Id.* at 603-05.

Not long thereafter, in *Koon v. United States*, the Supreme Court cited *Lara* favorably in holding that it was appropriate for the sentencing court to have downwardly departed pursuant to Section 3553(b) in sentencing police officers who had been convicted of violating the civil rights of Rodney King. *Koon v. United States*, 518 U.S. 81, 107 (1996). According to the High Court, the District court had rightfully considered the degree of "hardship" these defendants would face in prison due to their notoriety, a factor which was also deemed outside of the "heartland" of the Sentencing Guidelines. *Id.* at 112-13.

Following *Koon*, in this District, Judge Patterson granted a downward departure pursuant to Section 3553(b) to an inmate who had suffered "harsher incarceration" consisting of "extraordinary stress and fear" under "qualitatively different, substandard conditions" for the extended period he spent in a State holding facility. *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001). The Judge held a full-blown hearing, and in a thoughtful, encyclopedic opinion, offered that one rationale among others for downwardly departing was "emphasizing to government officials the necessity of addressing [such] conditions[.]" *Id;* (citing similar rationale of deterrence particularized by the court in *United States v. Sutton*, 973 F. Supp. 488, 491 (D.N.J) (1997), *aff'd*, 156 F.3d 1226 (3d Cir. 1998)).

Thereafter, in *United States v. Carty*, this Circuit expressly held, *per curiam*, that abnormally harsh pre-sentence conditions can be grounds for a downward departure. *United States v. Carty*, 264 F.3d 191 (2d Cir. 2001). The Court cited *Francis, supra*, but did not elaborate further.

Since *Carty*, other courts in this Circuit and elsewhere have followed suit in granting downward departures or variances under 18 U.S.C. Section 3553(a) based upon harsh pretrial confinement conditions, whether the condition suffered was long in duration or short and acute. *See, e.g., United States v. Torres*, 2005 WL 2087818 at *2 (S.D.N.Y. Aug. 30, 2005) (McKenna, J) (downwardly departing because the "enhanced deprivations . . . and suffering" by the defendant who was held in pretrial detention in Colombia would produce "a magnitude of punishment effectively disproportionate"); *United States v. Mateo*, 299 F.Supp.2d 201 (S.D.N.Y. 2004) (Judge Marrero downwardly departing *nine levels* where denial of medical attention and sexual harassment of a female inmate "inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration proscribed by the Guidelines"); *United States v. Speed Joyeros, S.A.*, 204 F. Supp. 2d 412, 441 (E.D.N.Y. 2002) (Judge Weinstein downwardly departing because of, *inter alia*, "the physical deterioration of the defendant" while in pretrial custody); *see also United States v. Roseboro*, 402 Fed. Appx. 657 at *2 (2d Cir. 2010) (District Court properly discharged its procedural obligations under 3553(a), including considering harsh pretrial conditions, before imposing sentence); *United States v. Fajardo*, 2006 WL 3498640 at *3-4 (S.D.N.Y. Dec. 5, 2006) (Sweet, J.) (taking note of substandard pretrial conditions under Section 3553(a) for purposes of determining proper sentence); *United States v. Rodriguez*, 213 F. Supp. 2d 1298, 1302 (M.D.

Ala.), *supplemented*, 214 F. Supp. 2d 1239 (M.D. Ala. 2002) (departing *two additional levels* on top of a five-level 5K1.1 departure in a case where defendant was raped by a prison guard during pretrial detention).[1]

      While most courts in the cases cited above granted "departures," we submit that the grounds asserted in those matters also provide justification for "variances" under 18 U.S.C. 3553(a). The only distinction is that where both departures and variances are available, the greater the relief, the greater the amount of justification is required by the court for purposes of review. *United States v. Sharvoja*, 740 F.2d 253 (2d Cir. 2014) (*citing Gall v. United States*, 552 U.S. 38, 47 (2007). Among the §3553(a) sentencing factors implicated here is "just punishment" under 3553(a) (2) (A) and "[needed] correctional treatment" under 3553(a) (2) (D).

      Courts are understandably reticent to interfere with the details of prison administration. That reluctance, however justifiable as a day-to-day proposition, should not interfere with this unique opportunity to deter future wholesale Eighth Amendment violations, like the ones here which have shocked the conscience of our entire community, by granting substantial sentencing relief to the inmates who suffered.  The same inherent powers of the court that operate to deter future violations of the Fourth Amendment rights of innocent citizens by freeing those that may be guilty, (*see United States v. Calandra*, 448 U.S. 338, 348 (1974)), or that enable the court to "establish and maintain civilized standards of procedure and justice," (*United States v. Baird*, 414 F.2d 700, 710 [2d Cir. 1969], *citing McNabb v. United States*, 318 U.S. 332, 340 [1943]), should operate to deter these constitutional violations as well, and not merely rely upon the potential for prisoners to bring lawsuits for damages or requests by the Justice Department for

---

[1] To obtain sentencing relief based on harsh pretrial conditions, the defendant needs to establish what occurred by preponderance the evidence. *United States v. Johnson*, 413 F. App'x 320, 322 (2d Cir. 2011).

prison monitors.  *See Jackson v. District of Columbia*, 254 F.3d 262 (2002) (federal court has the "inherent power" to protect prisoners while they exhaust their administrative remedies); *see also United States v. Sanchez-Gomez*, 859 F.3d 649, 655-66 (9th Cir. 2017) (*rehearing en banc*) (relying in part upon a court's "supervisory authority" to provide broad relief in dealing with Marshals' blanket policy of shackling prisoners in pretrial proceedings that denied defendants' right to "respectful treatment").

As the cases we have cited suggest, the amount of sentencing relief that should be afforded in cases of egregious pretrial punishment, like any sentencing decision, should be case-specific. We believe, however, that the relief afforded should be substantial enough to make a loud statement of condemnation by the Court about the horrific conditions endured by the inmates caused by mechanical failure and the lack of an adequate response thereto. Further, the relief sought should address the indifference and misrepresentations of officials which accompanied the undisputed conditions.

We argue that sentencing relief for those inmates involved would be appropriate and fairly analogous to the principles of punitive damages, as are available and often awarded to plaintiffs who suffer Eighth Amendment violations in prison.  In *Smith v. Wade*, 461 U.S. 30 (1983), the Court famously held that a prison guard could be held liable for punitive damages based upon reckless or careless disregard or indifference to inmate's rights and safety in a civil rights action under 42 U.S.C. Section 1983, even in the absence of proof of actual malicious intent.  The reason, the Court stated, is that the purpose of punitive damages is not to compensate the inmate but to act as a deterrent to those guards who might in the future violate a prisoner's rights in such a reckless, careless or indifferent manner.  *See, e.g., McFadden v. Sanchez*, 710 F.2d 907, 913 (2d Cir.1983) ("An award of punitive damages punishes a defendant who has

acted intentionally or recklessly to deny a plaintiff his protected rights and helps secure rights for others by deterring future violations"). The amount of punitive damages is a function of the "reprehensibility" of the conduct involved, and fraud is one element of reprehensibility. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575 (1996); s*ee, e.g. Blissett v.* Coughlin, 66 F.3d 531 (2d Cir. 1995); *Barrett v. United States*, 651 F. Supp. 615 (S.D.N.Y. 1986) (Motley, J.) (Evidence of fraud is admissible as a foundation for the awarding of punitive damages).

## Conclusion

As recounted, in part, in the PSR, the defendant has a ninth grade education and a limited work history.

> "At the time of his arrest, Robinson was employed as a cleaner. He is interested in earning his GED. The defendant will benefit from participation in a drug treatment program given his history of substance abuse. Robinson became involved in gang activity to make up for what was lacking in his home life. When he should have been attending school in the ninth grade, he had to contend with the death of his grandmother and supporting himself. The defendant and his brother reportedly resided alone in the projects at the time of his grandmother's death. It is unclear how much assistance his mother provided Robinson at the time. In any event, those circumstances were difficult for any 14- or 15-year-old to handle on his own. Unfortunately, the cycle of neglect will continue with the defendant being absent from his daughter's life. While the crimes he was charged with and the crime of conviction are horrible, and his background is certainly no justification for his criminal behavior, we submit that any sentence should take this history of abuse as a mitigating factor in pronouncing sentence." PSR p. 27

For the reasons discussed, we submit that James Robinson deserves a sentence below the Guidelines and the Court should impose such a sentence. That sentence would appropriately balance the § 3553(a) factors and would be "sufficient, but not greater than necessary."

Respectfully submitted,



12

Stewart L. Orden


cc:     All parties by ECF